Thank you. Madam Clerk, please call the next case. 310-0380, Erie Insurance Exchange, and the late Bruce M. Lipsmith v. Imperial Marble Corp. et al., House, by Brent Vinson. Mr. Vinson, you may proceed. It is my pleasure today. Please come right up here. Go back and forth to access all the materials. I'll tell you if you can bring them up with you now, if you. OK, that'd be fine. And then this is a recording microphone for you. It is my pleasure today to appear before this court on behalf of the appellant, Imperial Marble Corporation. We are here today on appeal of a summary judgment that was entered against my client. The first basis for summary judgment was on a declaratory judgment, finding no coverage for an underlying lawsuit under an insurance policy issued by the appellee, Erie Insurance Exchange. The second basis was a summary judgment on the estoppel defense, asserting that Erie was stopped from asserting the pollution exclusion, finding there was no issue of material fact, including summary judgment. We also appeal from the denial of our cross-motion for summary judgment on the declaratory judgment count, seeking a finding as a matter of law that there is, in fact, insurance coverage. The standard on all three of these counts is a de novo review here today. Cutting to the quick, as our time is somewhat limited, the primary basis of this case, the primary dispute in this case, is whether or not the pollution exclusion, also known as an absolute pollution exclusion, in the Erie insurance policy borrows coverage to my client for the underlying lawsuit. The parties concede, and I believe Illinois case law is pretty clear, that the Illinois Supreme Court's in the Columns case controls here. And this is an important case for a number of reasons, because I think it dictates why there is coverage here and why the trial court was in error. First, the Columns court rejected the literal reading of not only the absolute pollution exclusion in the policy, but also the policy's definition of pollutants, which is key, because that is really the dispute before the court. And instead, the Columns court said that the absolute pollution exclusion applies only to what it termed traditional environmental pollution. Unfortunately, the Columns court did not leave us with a clear definition of what traditional environmental pollution was in the decision, other than finding that the release of carbon monoxide from the furnace in the commercial building, at issue in that case, did not constitute traditional environmental pollution. In the context of the Columns case, which is the controlling law, we look at the underlying complaint, which was filed by, which is a putative class action filed against Imperial Marble by a group that we'll call the Cobzinas. The underlying case is still proceeding in this matter. This is a putative class that alleges for insurance policy purposes bodily injury and property damages resulting from Imperial's air emissions. The emissions, it alleges, odor and particulate that are migrating onto their property, causing personal injury and property damage from the air emissions generated during Imperial's manufacturing process. This is not an execute. What they're alleging is harm from air emissions. These air emissions, as set forth, as alluded to in the underlying complaint, and as set forth in the materials before the court in the obdentiary record, are omitted by Imperial pursuant to a validly issued, no dispute on that point, Title 5 permit under the Clean Air Act, which is issued by the Illinois Environmental Protection Agency under the auspices of and with the approval of the United States Environmental Protection Agency. What this basically means is that Imperial has gone through a lengthy permitting process. They have submitted their manufacturing process to review by two agencies. And these agencies have found that the omission of the substances specified in the permit are allowed and complied with both the Clean Air Act, its implementing regulations, as well as the Illinois Environmental Protection Act and its implementing permitting regulations, which were enacted pursuant to a delegation of federal authority to the state. Now, these are allowed emissions, am I correct? That is correct. So your argument is because they're allowed emissions, they're not hazardous? It's more than that. When we dive into the Clean Air Act and the Illinois Environmental Protection Act, these emissions are expressly defined as not being pollution by both the Clean Air Act and the Illinois Environmental Protection Act. And that is what I brought before the court here to kind of jump ahead. If one would take a look at 415 ILCS 5-9, section 9 is entitled Acts Prohibited. No person shall cause or threaten or allow the discharge or omission of any contaminant into the environment in any state so as to cause or tend to cause air pollution in Illinois. Clearly, air pollution is prohibited by the Illinois Environmental Protection Act. So therefore, and the regulations go into more detail on this, therefore, the omission below permitted level, below the threshold allowed in the permit, is by operation of law, by definition, not pollution, and therefore, not hazardous. At that level, it's not. At that level, does that preempt a torque line? It does not preempt an underlying torque line. It does, however, based on a permit shield in the permit as well as under the Illinois Environmental Protection Act, preclude governmental enforcement actions for actions taken within permitted limits. So there's no risk of a governmental enforcement unless there is a permit exceedance. Well, the policy doesn't really talk about hazardous, does it? It says we're not going to indemnify for pollutants. Am I correct? Broadly, yes. I mean, that's the language of the policy. There's a very broad definition of pollutants in the policy, which has been expressly rejected by columns as recognized by the recent Clean Harvest case from the Northern District of Illinois and frankly, as recognized by the Connecticut Specialty and the Kim cases, which are cited by ERI. They give a definition of what a pollutant would be in terms of hazardous material. And I wouldn't say it's a definition. I think the Connecticut Specialty case says that determining what is traditional environmental pollution is not scientific. It's an art. I would actually posit in this case it's scientific because the agencies have done a review and have determined what levels of the chemicals that issue here, primarily you have styrene and bethylmethacrylate, what levels of these chemicals are harmful to the public health and the public welfare. And the purpose statement of the Clean Air Act itself basically states that a primary goal of this chapter is to encourage or otherwise promote reasonable federal, state, and local governmental actions for pollution prevention. So we're dealing with a federal regulation that is designed to prevent pollution. The Illinois Act, the permitting provisions are enacted in conjunction with and under the authority of the United States Congress. And they define on a repeated basis that emissions within a permitted limit are not hazardous because they're allowed. And in fact, in the Citizens Against Ruining the Environment case, which we cite. They're saying they're not hazardous because they're allowed? At this particular, to be clear, at this threshold level. Well, does that change the character of the pollution just because you allow it? Well, I mean, your argument is that pollution defined by the case law must be hazardous, correct? My. I mean, that's what you were saying. Because I said this is just, I mean, policy defined pollutant. And it says we're not going to identify for pollutants. And you're saying, well, that's too broad. Pollutant really has to be hazardous, right? And that is, that's not my theory. That is straight from the Collins case. That's what I was just saying. Yes, absolutely. So there has to be some sort of hazard to be a pollutant. OK. And so now you're saying that because these agencies say there's a level we will allow, does that change the character of it as not being hazardous? It is not hazardous. According to these agencies, according to the regulations, it is not hazardous below the threshold levels. Otherwise, they could not, under the express language and the Citizens Against Marine and Environment case says this, could not authorize that permit. They could not allow a permit to be issued, the US EPA or the Illinois Environmental Protection Act, that authorized emissions that would be hazardous. And that is clear, Clean Air Act and Illinois Environmental Protection Act statute. What they're basically saying, and the Illinois Act defines it in terms of three things, characteristic, quantity, and duration. And it's basically saying one molecule is not hazardous. And we're trying to determine with the best available science what level is hazardous. And so what the acts say is that up to the threshold level, and I believe the federal regs, the CFR, allows specifically in the language for a margin of error. So you have a margin of error above a level to set a level above which would be hazardous and would not be allowed. So when going to the insurance policy and looking at Illinois laws as filtered through columns of the subsequent case law, the analysis is, is what is being emitted by Imperial Marble a pollutant? And the subset, going, taking a step back, would be, is that hazardous? Is it hazardous material? And styrene and these other items are hazardous when emitted in certain quantities, characteristics, and duration, or quantity, duration. So really what you're saying is, okay, Gary, quit hiding behind this policy language, come and defend us, because we have not, our records show, polluted above a level that would be hazardous, correct? What we're saying is that a permitted emission. Because they clearly wouldn't have to indemnify you if the records show otherwise. If, our position is that if we're within permitted limits, they would have to defend and indemnify us. And if there are receipts. The reasons I identify, because by your definition, if they're within polluted limits, there should be no damages there that they're obligated to indemnify you for. I believe we'll establish that in an underlying case. But right now, that case is still pending. Yeah, because you understand what I'm saying. I absolutely do. I mean, you know, you got two, you take that policy apart. You're buying two coverages. You're buying duty to defend. You're buying indemnification. Correct. Okay. And so you're telling us that indemnification just is not even a factor here, because by this regulatory scheme, it's not hazardous. If you're within those limits of admitting, right? Correct. And indemnification on a procedural note was not a part of our summary judgment motion. Right. It was only on the duty to defend. Correct. Okay. Two minutes. The one question that's been raised that I'd like to assert here is, why would you look at these acts as opposed to other authorities here? Why would, if this is raised, and Mary's brief was raised by the trial court, why would you look at the Clean Air Act and the Illinois Environmental Protection Act as opposed to some of the cases? First, the Illinois cases don't deal with permanent emissions. None of them do. They deal with substances that in each instance have been agreed to be hazardous. So that's not an issue that's really, other than the Stringfield case, which was decided before Collins, that's not an issue that's really been presented to an appellate court in Illinois. Why would you look at these acts? Because you're looking at the pervasive federal and state regulation for pollution control. And they expressly define what is and what is not air pollution. And they specifically go through an analysis on a very scientific basis. And if you take the time to wade through, which is certainly very unpleasant to put in federal regulations, and look at some of these charts, they break it down by industry group, and they tell you what you can emit at certain levels. This is very scientific. This is, I would say, we cite the Madigan case versus PSI. This is the pervasive, this occupies the field in the area. So when you're dealing with permitted emissions, the authority that should be referred to would be the Clean Air Act and the Illinois Act, because they actually define what is and what is not hazardous in terms of a permitted emission. So all the other cases that don't deal with permitted emissions are not really, they're certainly instructive, but they're not guided here. They can tell you what Illinois law is, but the definitions in the Clean Air Act and the Illinois Act, which specifically define a permitted emission as not being hazardous, should control by virtue of this being from this comprehensive federal statute and from the comprehensive state statutes and state regulations and federal regulations that implement it. And we would basically run through this in terms of, you look at the underlying complaint, the alleged harm, at least in part, from permitted emissions. There's no issue that the harm alleged is from permitted emissions. Permitted emissions are underneath these, or are under the controlling law, Clean Air Act and Illinois Act, not hazardous. So therefore, on a duty to defend, because harm is alleged from permitted emissions, a duty to defend is clearly owed in this case. If, so what you're saying is the underlying tort claim, that they do not have to allege or prove that you were above the permitted emissions? They, in the underlying claim, under the Illinois duty to defend law, they allege both. They do allege exceedances and they do allege harm based on the fact that we permit, that we admit anything. But based on this federal law, can they recover unless they prove that they were harmed by things that exceed, that you were over your permitted emissions? The federal law is not a per se bar, no. It is impractical, very difficult for them to recover, particularly since they didn't participate in the permitting process, and there's a public notice and public hearing in the permitting process. It's very difficult. I imagine, as the case progresses, they would have a very difficult time meeting a FRI standard and putting together a case on that basis. I just, thank you. Thank you. Is it Mr. Lickstein? Lickstein. Oh, we have a typo here. No, it's probably not. Oh, oh, it's not. It's T-S. You can't look at it when you pronounce it. The T is in the wrong place. But it's still pronounced Lickstein. I've been apologizing for that for my entire life. Oh, okay. No need to. I'll apologize again. It's an Ellis Island joke. May it please the court, counsel, my name is Bruce Lickstein, and I represent Area Insurance Exchange in this matter. And I would like to first jump in on the comments I believe that Justice Schmidt made and go in the reverse order of the outline that I prepared based on the comments of the Imperial's counsel. The question of whether the underlying plaintiffs can proceed in their case exemplifies the erroneous argument that Imperial is making here. Because the suggestion in your question, Justice Schmidt, is that, I believe, the underlying plaintiffs are not barred from anything. They don't care if there's a federal standard or a regulatory standard or a state standard for the emissions, period. And as counsel conceded, their claim is not barred regardless of whether the standards are exceeded or not, or whether they are emitting their styrene and the other chemicals within the permitted limits. So my client is in a trick bag because what Imperial wants is, in the first part of the policy for the coverage clause, is to say that the facts alleged in the complaint are sufficient to trigger a duty to defend because they allege harm and bodily injury. And they allege that the emissions were hazardous. But then at the same time, what they argue is that those emissions are hazardous enough for the duty to defend, but they're not hazardous enough to trigger the absolute pollution exclusion. And you simply can't have it both ways. Either the emissions are not hazardous at all and the underlying complaint should be dismissed or preempted, which is clearly not the law and not the case and not going to happen, or the underlying allegations and the underlying complaint are sufficient to trigger both the coverage clause and the other parts of the policy because the policy has to be read as a cohesive whole, or actually not the policy, the underlying complaint has to be read as a consistent document such that it's hazardous, that hazards are alleged or they are not alleged. But if they are alleged, then that automatically triggers the absolute pollution exclusion. It's a zero-sum game. There's no way around it. And to say that we have a duty to defend, but we can't rely on other terms in the policy would be entirely inappropriate from the contract construction point of view and from a common sense point of view. The regulatory argument that Imperial is trying to make suffers from a number of infirmities, we believe, in addition to the trick bag that they're trying to put us in. First of all, the idea that the court should look beyond the four corners of the document into the regulatory scheme to decide whether there's a duty to defend, we believe, is erroneous. There are certain extenuating circumstances that the Supreme Court has allowed trial courts to look beyond the four corners. I'm sure the court is familiar with the Pekin versus Wilson case, which Imperial cited. And there are certain limited, or what the Pekin court described as unusual or compelling circumstances, where a court can look outside the four corners. And in that case, the court was looking at another pleading to determine whether the self-defense exception to the intentional tort exclusion should be invoked to find coverage. And in the whole Burden Root case, and in other cases, in the Ambaradine case, they look at other pleadings. But what they don't do, what the trial court, we don't believe, is authorized to do is to take a wholesale departure from the terms of the policy and the allegations and the complaint and engraft its own view of what should be done in this case. The regulations don't replace the whole body of coverage case law in Illinois. And there is no case that says that. There is no case that holds that the court should do that. Well, to summarize it, what you're saying is, is we look to the complaint filed by the plaintiffs, and they are alleging hazardous pollution. Am I correct? That is correct, Your Honor. And you're saying, OK, match that complaint's allegations up with the contract we have with the defendant? Yes. I mean, that's the comparative, not some type of argument of defense from these federal and state regulations. That's right. And I would allow, though, that there is room in the case law on certain occasions, as I said, where there are compelling circumstances, to look beyond the four corners of the complaint and the four corners of the insurance policy to try to decide what the duty to defend is. Those compelling circumstances don't exist here. Even more to the point is that in the regulations on which Imperial relies to try to create a duty to defend, the regulations say, and we have quoted this in our brief, that all other laws apply except those laws that relate to air pollution control. The insurance coverage case law in Illinois is not law that relates to air pollution control. This case has nothing to do with air pollution control. It has to do with the construction of an insurance policy. So the idea that the regulations, as Imperial claims, should preempt all of the case law, again, we believe is erroneous. If that were the case, there would be no coverage case law on which to make an analysis of whether there's a duty to defend. The regulations would preempt the entire field, so to speak, and there would be nothing left, because certainly the regulations don't discuss an analysis of how to compare an insurance policy and how to arrive at the decision as to whether there's a duty to defend under the insurance policy. So the idea that the entire field has been preempted, we believe is incorrect. And as the regulations themselves say, they don't preempt everything. They only preempt areas where there is air pollution control that's at issue. And in fact, there is no case that Imperial has cited for that proposition either. It's also true that the idea that the allegations in the underlying complaint, or I emissions from Imperial's plant are not hazardous, seems to turn the entire idea of pollution and permitted pollution just on its head. Because the regulations never explicitly say that permitted emissions are not hazardous. What they say is that they are designed to prevent pollution. And the very fact of the existence of the regulations, in our view, demonstrates that the emissions that Imperial is conducting are potentially hazardous. The fact that a lawsuit was filed in the underlying complaint is also proof that the emissions that Imperial is discharging into the environment are hazardous or potentially hazardous. So contrary to the idea that permitted pollutions show that there is no hazard, we believe that the existence of the regulations is proof positive that they are hazardous. Otherwise, why else would they be regulated? And why else would the underlying plaintiffs have filed a lawsuit? Isn't that exactly Imperial's argument, is that because of the permit, that it's been established with some degree of scientific certainty that, at these levels, that these things would otherwise be pollutants and be hazardous are not so, because of the levels that they're being admitted at. That is their contention. Certainly it is. But there is no proof in the record, first of all, that the dose and duration of Imperial's hazards, of Imperial's emissions, are not hazardous. They have made a bit of an implied argument that, because they are emitted pursuant to the regs, that they're not hazardous, because the regs are designed to prevent pollution. There is no evidence in the record that says dose and duration for styrene is x, and below x, it's not hazardous. Isn't that, though, the crux, is that this case hasn't gone that far? That that is the question of fact that we're dealing with, is whether or not, at a permitted level, it is or is not hazardous. Because I think you have to, under columns, that you're going to have to show that this is something that has been traditionally associated with environmental pollution. And then we have cases in that pollution has to be something that's hazardous. Well, two things to respond to that question, Justice O'Brien. First, the hazard is based on the facts that are alleged in the underlying complaint. Because as I said before, we're eerie not to benefit from the hazards alleged in the underlying complaint, and owe a duty to defend based on what's alleged. But thereafter, not have the benefit of using the hazard alleged to invoke the absolute pollution exclusion seems to me to be fundamentally unfair. Also, fundamentally at odds with how you should interpret and construct an insurance policy, or any contract, for that matter. As I said at the beginning, if it's hazardous enough for us to come in on a duty to defend, to show an occurrence within the coverage clause, and so on and so forth, in a bodily injury alleged, then it should be sufficient for us to be able to invoke the absolute pollution exclusion. That's my first point. My second point is that columns is the beginning of the analysis. And there is much that Imperial and Erie agree on. And that is that the case law is fairly consistent. And in columns, and I believe council correctly, accurately stated this, columns said that we are not going to adopt wholesale the absolute pollution exclusion in your policies. But we are going to come up with something that's more workable. And we're going to call it traditional environmental pollution. And I think council was also correct in saying that they didn't define it. However, since columns, and in particular, in particular, the loop paper case, that's where the Illinois law defined what traditional environmental pollution is. And there is no escaping the fact that how Illinois courts have defined traditional environmental pollution in loop paper, and how it has been applied subsequent to loop paper, has also been a very consistent approach. And that approach is very simple. If you emit, if you discharge something into the atmosphere, and it leaves your premises, that's traditional environmental pollution. Now, columns talked about the explosion with environmental pollution in the sense of industrial pollution, and PCBs, and so on and so forth. But if you look at the scope of the cases that have been decided under that standard, it goes well beyond what a layperson would consider traditional environmental pollution at, for example, the industrial plant in outboard marine. We have got cases, loop paper itself is representative of the fact that we're not talking about traditional environmental pollution, because loop paper applied the exclusion based on a fire that was set at a recycling plant that was set by vandals. And the smoke and the fumes went off site to the neighboring property, and the court said that's traditional environmental pollution, because you had fumes that started on your property and went someplace else. That's how Illinois defines traditional environmental pollution. So thank you. So that would be my response to how we address this problem. The first line, I believe, in our response brief said that this is not a novel case. This is not an unusual case. Imperial has framed it so that they try to make it an unusual case. But it can be decided under the existing and well-settled principles of coverage case law in Illinois. If you look at the Pacific Harbors case that counsel alluded to, the court did not apply the pollution exclusion, because in that case, which was a bodily injury case, the plaintiff in the underlying case allegedly suffered the harm at Pacific Employers Plant. And because the discharges didn't leave that property, it wasn't traditional environmental pollution. The courts had taken a very simple approach to how to apply that standard. And in every case, in the Grand Adam case, in the cases before Columns and in the cases after Columns, in every single case, if there is a discharge into the air or into the ground of some type of pollution or contaminant, the courts will uphold the exclusion. And there has never been a case that hasn't upheld the pollution based on that standard. And Imperial hasn't cited any case law in either Illinois or any other jurisdiction where that standard has been abandoned. A court that has followed the traditional environmental contamination standard, as Illinois does, there is no authority for the proposition that it should be abandoned, just because the manufacturer is emitting the pollution under a permit. Thank you. OK. Thank you, Mr. Lickstein. Mr. Vincent, you may reply. I will. Thank you. First, to address some of the points made by Mr. Lickstein, certainly there's nothing in Illinois law that says that the court cannot consider a federal statute. I don't think that really applies at all with the Wilson case or the whole Bird and Root case. The court is clearly free when determining whether there's coverage to look at insurance coverage case laws, as well as federal statutes and other law. Common law or statutory. So I don't think there's any bar in the case law that says that the court is somehow prohibited from looking at federal law or federal statute. Secondly, in responding to the trick box argument, I think there's two separate concepts. My client's been sued. We have an insurance policy. We have tendered the suit for coverage. Illinois law is pretty clear that if it falls within the parameters of coverage, the suit is covered, whether it's a good suit or if it's a frivolous suit. We're entitled to a defense. So there's a suit that meets the parameters of coverage. It alleges personal injury and bodily damage from an occurrence during the policy period and all those things. And that's a separate entire analysis from whether or not an exclusion applies. Because an exclusion only comes into play when coverage is there. And the exclusion operates after determination has made that the policy is triggered. So here we're asserting, I think entirely consistently, that the policy was triggered by the underlying complaint. And then we look at the exclusion raised by Erie to deny coverage, which is the pollution exclusion. And we're stating that under Illinois law, that that exclusion does not apply here. And that if you look at the allegations of the underlying complaint, taking what the Illinois Supreme Court has said in the Pekin versus Wilson and other cases, and looking at other admitted facts in the evidentiary record, which would include the permit. And as a side note, in the record is Imperial's permit. It's part of the appendix to our brief, as well as in the record, which lays out what is admitted and levels. As well as a declaration of a gentleman named Donald Sutton. Mr. Sutton used to be the chief air permitting officer for the Illinois Environmental Protection Agency. He actually issued Imperial's permit. And Mr. Sutton's declaration walks through and says, what the various limitations are on Imperial's admission. So that is in the record and before the court. And basically, and also in response to the point that there is a suggestion or an implication in our brief that the statute should apply or that they preempt, what we're basically saying is this. I disagree. What we're saying is this, is that there is an issue as to whether or not a permitted admission under a Title V permit constitutes pollution. And we're saying that the authoritative source to determine that would be the Clean Air Act and the Illinois Environmental Protection Act. We're not saying that we're preempting all other Illinois case law or things of that nature. We're saying that when defining this term, which is the key term to be defined, whether or not there's a duty to defend here, these are the controlling authorities because they define what pollution is. They issue the permits. They review the permits. They are the authorities to look at in defining this one term. And frankly, on two final points, everything that we're asking is very consistent with Illinois coverage law. The Blue Paper case involved a situation where the parties agreed that the fumes emitted were hazardous. There was no dispute in that case. The Kim case, they admit that the perk is hazardous. Every other case, there is not a dispute here as to whether or not the emitted material is hazardous. That's what we're disputing. And so when Kim and Blue Paper define pollution as hazardous material that migrates off-site, we're not disputing that that is the law or that's what it says. We're saying that this isn't hazardous material. If one molecule, and to take Erie's argument, it's kind of ridiculous, I don't think anyone's saying under these cases that if one molecule of something migrates off-site, that's pollution. That's exactly what the Collins case says is not the case. We're going to use a rule of reason here. Well, I'm not sure. Let me just ask, do you know are there either policies or writers available for persons or companies such as your client to provide them coverage for any damage claimed by emissions? There are. And in the record, we on the Estoppo claim, our client subsequently, in about 2008, did purchase a pollution product. These were products that have only recently become available. There is separate pollution insurance that is available. And the final point is going to the Clean Harbors case, is one of the reasons they found that the pollution inclusion did not apply there was that because under a CGL policy, it's designed to cover for the risks attended within one's normal business operations. How serious time is that? May I finish my sentence? Imperial's normal business operations are manufacturing cultured marble. And as part of our normal operations, we emit pursuant to our Title V permit. So from a policy basis, this is exactly the kind of claim that should be covered because it's something attended exactly to Imperial's business operations. And Imperial was well aware of who we were and what we did when they wrote the policy. Thank you all for your time. Thank you, counsel, for your arguments in this matter this afternoon. It will be taken under advisement and a written disposition shall issue. The court shall stand and brief recess for panel.